# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROBERT REARICK, | : | |
| Plaintiff, | : | Case No. 3:08cv00093 |
| vs. | : | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. INTRODUCTION

Plaintiff Robert Rearick suffers from certain health problems including breathing difficulties, right-side pain, and hot, dizzy spells with nausea. (Tr. 65, 360-62). His health problems prevent him from performing his past work as an automobile self-service attendant and a construction worker. (Tr. 23).

On July 19, 2005, Plaintiff sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) claiming he had been under a disability since January 9, 2005. (Tr. 56-58, 303-06). After various administrative proceedings, Administrative Law Judge (ALJ) Daniel R. Shell denied Plaintiff's DIB and SSI applications based on the conclusion that Plaintiff's health difficulties did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 15-25). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g) and 1383(c)(3), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and a remand to the Social Security Administration for payment of benefits or, at a minimum, a remand to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.  FACTUAL BACKGROUND

At the time of the ALJ's decision, Plaintiff's age (slightly older than 50 years) placed him in the category of a person "closely approaching advanced age" for purposes of resolving his DIB and SSI applications. *See* 20 C.F.R. §§404.1563(d), 416.963(d); s*ee also* Tr. 23. Plaintiff has a high school education. (Doc. #9 at 3) (citing Tr. 23, finding 7).

Plaintiff explains in his Statement of Errors that he "has had longstanding pulmonary problems." (Doc. #9 at 3). He testified during the ALJ's hearing that he cannot work five days a week, eight hours a day in a job requiring him to lift 20-50 pounds. (Tr. 360). He asserted that he is so ill when he wakes up in the morning that he "can't even move many days." (Tr. 360). He further explained, "I can barely walk around for 30 minutes and then I have to sit and rest. *Id.*

Plaintiff testified that he takes injections of Sandostatin for three weeks, then on the fourth week he gives himself injections three times a day and travels to Ohio State University for an injection. (Tr. 360-61). He testified, "The fourth week I'm just down completely. I can't move or anything at all." (Tr. 361). His symptoms include "[v]ery severe diarrhea, flushing, body getting heated and fainting." *Id*. He testified, "The last week is just laying there not even wanting to watch TV, not wanting to eat..., just not wanting to move around at all." *Id*. The injections only help him "move a little and not

lay there on the couch." (Tr. 362). But he does not and cannot lift anything. *Id.*

In his Statement of Errors, Plaintiff notes that Sandostatin "is an injectible medication used 'to reduce flushing and watery diarrhea caused by cancerous tumors (carcinoid syndrome).'" (Doc. #9 at 4, n.2).[2]

Turning to the other evidence and other information in the administrative record, the parties have provided informative and detailed descriptions of that evidence. *See* Doc. #9 at 1-9; Doc. #10 at 1-10. In light of this, and upon consideration of the complete administrative record, additional detailed discussion of the record would be unnecessarily duplicative. Yet a brief description of the medical sources upon whom the parties rely will help frame further review.

Plaintiff relies on the opinions of his long-term treating pulmonologist Dr. Wagshul. Plaintiff has been a patient of Dr. Wagshul's since 1994. *See* Tr. 186. Dr. Wagshul began seeing Plaintiff almost monthly at least since 2003. *See* Tr. 158-186.

In a letter written in September 2006, Dr. Wagshul noted that Plaintiff had been a patient of his since 1994 for management and treatment of chronic obstructive pulmonary disease. (Tr. 296). Dr. Wagshul explained that Plaintiff was diagnosed with malignant lesions in the right lung in March 2005 and was sent to The Ohio State University for a work-up for carcinoid syndrome. *Id.* Dr. Wagshul further noted:

> Patient continues to have <u>severe fatigue</u>, chest pain, shortness of breath, productive cough, wheezing, chest tightness, chest soreness, lightheadedness and some nausea. My opinion is that Robert Rearick is totally disabled. Patient is unable to do any kind of work.

(Tr. 296)(emphasis in original, *see* Doc. #9 at 6).

Plaintiff also relies on Dr. Wagshul's treatment records as well as the treatment

---

[2] (quoting in part http://www.drugs.com/mtm/sandostatin-injectible.html). Sandostatin, a U.S. brand name for "octreotide," "may also be used for other medical conditions as determined by [a] doctor." http://www.mayoclinic.com/health/drug-information/DR601739. Such conditions include, for example, AIDS-related diarrhea, chemotherapy-induced diarrhea, and insulin-producing tumors of the pancreas. *Id.*

3

records of his treating physicians at Ohio State University including his treating oncologist Dr. Shaw. *See* Doc. #9 at 3-7, 9-13.

Dr. Richard Gardner testified as a medical expert during the ALJ's hearing. (Tr. 353-59). He reviewed Plaintiff's medical records and first observed that Plaintiff had undergone a pulmonary function study in November 2004. The study revealed a mild obstruction and scores that were not severe enough to meet the criteria of an impairment in the Commissioner's Listing of Impairments.[3] (Tr. 354). Dr. Gardner then testified at some length:

> We have a CT scan of the chest ... showing some right paratracheal adenopathy, some mediastinal adenopathy. And the In April 2005 ... mediastinal biopsy and the pathology report ... shows a focal non-necrotizing granuloma or non-caseating granuloma. Did not give a diagnosis of any type of malignancy in that. This would be more, a non-necrotizing granuloma, non-caseating, it would be more consistent with a diagnosis of sarcoidosis. The cause of persistence of symptoms of flushing and diarrhea the patient was referred to the Ohio State Medical facility. [A]nd several studies [were] done at ... Ohio State, and we worried about ... carcinoid syndrome, which is ... there are certain neuroendrocrine tumors ... that secrete polypeptides that can cause symptoms of flushing and diarrhea, various reactions. The patient had a complete workup and he had no evidence of any type of neuroendocrine tumor of this nature. [In] February '05, [Plaintiff had] an OctreoScan, which is a scan that will pick up these neuroendocrine tumors and this was negative, absolutely no pick up, showing no evidence of any type of neuroendocrine tumor. The cause and symptoms, patient was started on Sandostatin, and this is a medicine that block the effect of these neuropeptides. Again, this was given entirely on the basis of symptomatology and no objective evidence of any ... neuropeptides being present. And then ... Ohio State Clinic reports, no evidence of [INAUDIBLE] disease in July 2006, and Dr. Shah's ... his doctor up there. However, they did continue the Sandostatin injections and thought he was getting some improvement in his symptoms. [A] CT of the chest, July 2006, reported decrease in the mediastinal adenopathy.... In regard to his pulmonary condition, the patient ... did have some evidence of

---

[3] *See infra*, §III, referring to the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

4

> mediastinal adenopathy, and non-caseating granuloma, non-malignancy. Mediastinal lymph nodes has improved. Does have evidence of recurrent episodes of bronchitis treated with frequent antibiotics and corticosteroids and to further discuss the pulmonary function studies as far as chronic pulmonary insufficiency....

(Tr. 354-56). Dr. Gardner opined that Plaintiff's pulmonary condition did not meet or equal the criteria of an impairment in the Commissioner's Listings. (Tr. 356). And he noted that the record contains no evidence of any type of malignancy as to carcinoid syndrome. (Tr. 356).

Turning to Plaintiff's work abilities, Dr. Gardner "saw very little decrease in [Plaintiff's] ... residual functional capacity...." (Tr. 357). He believed Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; he could sit or stand for 6 hours during an 8-hour period; and he had several environmental work restrictions – "a moderate restriction in regard to dust, fumes, humidity, extremes in temperature" – due to chronic bronchitis. (Tr. 357). Dr. Gardner acknowledged that he did not really consider Plaintiff's fatigue when assessing his Residual Functional Capacity, and Dr. Gardner further testified that Sandostatin injections are usually given to patients with advanced carcinoid tumors. (Tr. 358).

### III. ADMINISTRATIVE REVIEW

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v.*

*Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 23-31; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[4] Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

In the present case the ALJ found at Step 1 that Plaintiff had not engaged in any substantial gainful activity since his claimed disability onset date. (Tr.17).

At Step 2 the ALJ determined that Plaintiff had the severe impairments of chronic pulmonary insufficiency and mediastinal adenopathy. (Tr. 17).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or a combination of impairments that meet or equal one in the Listings. (Tr. 20).

At Step 4 the ALJ found that Plaintiff had the Residual Functional Capacity to

---

[4] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations. Plaintiff meets the insured-status requirement for DIB eligibility through December 2008. *See Colvin*, 475 F.3d at 730; *see also* Tr. 36.

perform a limited range of medium work.[5] The ALJ described his specific findings as follows:

> [T]he claimant has the residual functional capacity to lifting 50 pounds occasionally and 20 pounds frequently, can stand/walk for a combined total of 6 hours during an 8-hour workday, and he must work in a clean-air environment that does not expose the worker to temperature extremes (i.e., above 75 degrees o[r] below 20 degrees fahrenheit), high humidity, such as found in the paper-making industry, high particulate levels, such as found in grinding or deburring operations, or noxious fumes, such as found in the petro-chemical, plastics, or rubber-making industries.

(Tr. 20). The ALJ also concluded that although Plaintiff's impairments could reasonably be expected to produce some of his alleged symptoms, his "statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible." (Tr. 22). The ALJ further concluded at Step 4 that Plaintiff could not perform his past relevant work as an automobile self-service attendant or a construction worker. (Tr. 23).

The ALJ's assessment of Plaintiff's Residual Functional Capacity, along with the ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI. (Tr. 17-23).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

---

[5] Under the Regulations, "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §416.967(c).

Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass II*, 499 F.3d at 512 (and cases cited therein).

## V.  DISCUSSION

Plaintiff contends that the ALJ erred by rejecting Plaintiff's testimony that he suffers from debilitating levels of fatigue one week each month. He reasons that the ALJ's credibility findings were factually incorrect in many specific respects. *See* Doc. #9

at 9-13. And Plaintiff emphasizes that his "most disabling symptom is his fatigue." (Doc. #9 at 9).

The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff's complaints concerning the intensity, persistence, and limiting effects of fatigue were not entirely credible.

"'There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record.'" *Cruse v. Commissioner of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(quoting *Jones v. Commissioner of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003)(other citation omitted). "However, 'an ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability.' " *Cruse*, 502 F.3d at 542 (quoting in part *Jones*, 336 F.3d at 476, citing *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). "Notably, an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility." *Cruse*, 502 F.3d at 542.

"[T]he ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting in part Soc. Sec. Ruling 96-7p, 1996 WL 374186 at *4). Substantial evidence must support the ALJ's credibility findings. *See Cruse*, 502 F.3d at 542; *see also Walters*, 127 F.3d at 531.

The ALJ found that the objective medical evidence do not document more than a mild degree of pulmonary insufficiency. (Tr. 22). The ALJ also concluded, "objective test results are not consistent with either carcinoid syndrome or a malignant process anywhere in the claimant's body." *Id.* Although the treating physicians of record have yet to definitively diagnose Plaintiff's disease process, his condition responded to treatment as if it were a carcinoid syndrome, according to his treating oncologist, Dr.

Shah. Indeed, she has treated Plaintiff as if his condition were equal to a carcinoid syndrome. *See, e.g,* Tr. 137-38. Dr. Gardner, the medical expert who testified during the administrative hearing, agreed that Sandostatin injections are typically used for advanced carcinoid tumors. (Tr. 358). And even though test results did not definitively document a carcinoid syndrome, the tests were not simply negative. A PET CT scan of Plaintiff's whole body showed some abnormalities in the right lung of unknown significance. There were also abnormalities in both hilar areas. The results were consistent with either a malignant or inflammatory lesions. (Tr. 117-18). A CT of Plaintiff's neck showed some reactive type lymph nodes. (Tr. 119). Biopsy of the mediastinal tissue was consistent with a noncaseating granuloma. Dr. Wagshul, in fact, initially diagnosed a mediastinal sarcoidosis before referring Plaintiff to The Ohio State University for follow-up. (Tr. 161)

In addition, Dr. Shah accepted as credible Plaintiff's report about his symptoms after he had Sandostatin injection. (Tr. 138). She adjusted his medication dosage in hopes she could keep Plaintiff's symptoms at bay for the entire four-week period of injections. *Id*. Unfortunately, Dr. Shah's flowsheet documenting Plaintiff's neuroendocrine symptoms on the dates when he came to Dr. Shah's office for injections showed that his fatigue continued to increase throughout 2006, as did his other symptoms (diarrhea) in the last few days of the treatment cycle. (Tr. 256).

Next, Dr. Gardner, upon whose opinion the ALJ heavily relied for his assessment of Plaintiff's Residual Functional Capacity, simply never addressed Plaintiff's fatigue. In fact, Dr. Gardner stated that he "did not recall a lot of fatigue complaints" as he read through the record. (Tr. 359). Even the administrative law judge recognized that Dr. Shah documented Plaintiff's complaints of fatigue. *See* Tr. 22. And Dr. Wagshul's notes, although brief, document some reports of fatigue and other symptoms that concerned him enough to send Plaintiff to Ohio State University for further testing and treatment, which ultimately led to a referral to an oncologist. *See* Tr. 160-63. The ALJ also assumed that because Dr. Wagshul did not specifically mention fatigue in his notes,

10

Plaintiff did not report any fatigue to him. It should be noted that Dr. Wagshul's notes are significantly less thorough than the records from the Ohio State University. A visit with Dr. Wagshul typically generated a one-sentence statement of symptoms. *E.g.,* Tr. 162. A visit at The Ohio State University typically generated a two-to-three page report. *E.g.*, Tr.137-40. Additionally, oncologist Dr. Shah treated Plaintiff's chronic lung condition as carcinoid syndrome. *See* Tr. 137-57. Fatigue was a symptom of this illness. In contrast, Dr. Wagshul often treated Plaintiff for more acute flare-up of his pulmonary problems. For example, in late 2005 testing was positive for a bacterial infections (Mycoplasma, Chlamydial), requiring antibiotic treatment. (Tr. 159). In June 2006 Plaintiff experienced increased chest congestion requiring a tapering dose of Prednisone. (Tr. 297). Dr. Wagshul, moreover, was well aware of Plaintiff's treatment at Ohio State and his attendant complaints since the treatment reports were sent to him on a regular basis. *E.g.*, Tr. 154.

Accordingly, Plaintiff's challenges to the ALJ's credibility decision are well taken.[6]

## VI.  REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

[6] Because of this conclusion, and the resulting need to remand this case for further administrative proceedings, an in-depth analysis of Plaintiff's remaining challenges to the ALJ's decision is unwarranted.

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See id.*

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand, the ALJ should be directed to determine anew, through the sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for SSI and/or DIB.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability determination be vacated;

2. No finding be made as to whether Plaintiff Robert Rearick was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.

February 10, 2009
    s/ Sharon L. Ovington
    Sharon L. Ovington
    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).